UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED** D/F
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ APR 1 8 2012 ★

BROOKLYN OFFICE

-------------------------------------------------------------------X

KATE GORBATY,

                Plaintiff,

    -against-

WELLS FARGO BANK, N.A. AND WELLS
FARGO HOME MORTGAGE, INC.,

              Defendants.

**MEMORANDUM & ORDER**

**10-CV-3291 (NGG) (SMG)**

-------------------------------------------------------------------X
-------------------------------------------------------------------X

KATE GORBATY,

                Plaintiff,

    -against-

WELLS FARGO BANK, N.A. AND WELLS
FARGO HOME EQUITY,

              Defendants.

**MEMORANDUM & ORDER**

**10-CV-3354 (NGG) (SMG)**

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Kate Gorbaty brings two consolidated actions against Defendants Wells Fargo

Bank, N.A., Wells Fargo Home Mortgage, Inc., and Wells Fargo Home Equity (collectively,

"Wells Fargo"). In 2007, Wells Fargo granted Gorbaty a mortgage and a home equity loan in

connection with Gorbaty's purchase of a new home in Scotch Plains, New Jersey. Gorbaty

claims that Wells Fargo failed to provide her with certain required disclosures regarding the

loans and that the disclosures it did provide contained flawed or inconsistent information. She

also alleges that Wells Fargo wrongfully refused on five occasions to modify her loan payments.

Gorbaty's two Complaints assert nine causes of action under federal and New York law:

(1) violation of the Real Estate Settlement Procedures Act ("RESPA"); (2) violation of the Truth

in Lending Act ("TILA"); (3) violation of the Home Ownership and Equity Protection Act ("HOEPA"); (4) breach of contract as an intended third-party beneficiary of the contract between Wells Fargo and the United States Treasury pursuant to the Home Affordable Mortgage Program ("HAMP") and Second Lien Modification Program ("2MP"); (5) violation of the Due Process Clause of the Fifth Amendment; (6) violation of New York's Deceptive Practices Act ("DPA"); (7) breach of an implied covenant of good faith and fair dealing; (8) common law fraud; and (9) civil conspiracy to commit fraud. Wells Fargo now moves to dismiss each of Gorbaty's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below, Wells Fargo's motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND[1]

In July 2007, Wells Fargo granted Kate Gorbaty a mortgage for $276,000 (the "Mortgage Loan") and a home equity loan for $69,000 (the "Equity Loan") in connection with Gorbaty's purchase of a new home in Scotch Plains, New Jersey. (Mortg. Compl. (No. 10-CV-3291 Docket Entry # 1) ¶¶ 1, 7-8; Equity Compl. (No. 10-CV-3354 Docket Entry # 1) ¶¶ 8-9.[2]) The closing for both loans occurred on July 23, 2007. (Mortg. Compl. ¶ 7; Equity Compl. ¶ 7.)

As will be discussed below, a number of federal statutes require mortgage lenders to provide borrowers with various disclosures explaining the terms of their loans. Gorbaty alleges that Wells Fargo did not provide her with certain required disclosures and that the disclosures it did provide contained flawed information or were inconsistent with disclosures Wells Fargo later

---

[1]    For the purposes of ruling on Wells Fargo's motion to dismiss, the court accepts as true the factual allegations in Gorbaty's Complaints. See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

[2]    The "Mortgage Complaint" or "Mortg. Compl." refers to the Complaint filed in Case Number 10-CV-3291 regarding the Mortgage Loan. The "Equity Complaint" or "Equity Compl." refers to the Complaint filed in Case Number 10-CV-3354 regarding the Equity Loan. Unless otherwise stated, all docket entry numbers refer to Case Number 10-CV-3291.

provided in response to informational inquiries Gorbaty made in 2010.[3]  (Mortg. Compl. ¶¶ 10-20; Equity Compl. ¶¶ 11-25.)

On at least five occasions beginning in November 2008 and continuing through 2010, Gorbaty sought a loan modification from Wells Fargo pursuant to HAMP; four of her applications were denied and she has not yet received a response to her fifth. (Mortg. Compl. ¶¶ 21-26.) At some point in 2010, Gorbaty stopped making payments due under both of her loans (Pl. Objections (Docket Entry # 80) at 5), but Wells Fargo apparently has not moved to foreclose on her home (Tr. of Nov. 1, 2011 (Docket Entry # 75) at 10).

On July 16, 2010, Gorbaty filed the Mortgage and Equity Complaints, asserting nine causes of action against Wells Fargo. Five actions are brought under federal law: (1) violation of the RESPA; (2) violation of the TILA; (3) violation of the HOEPA; (4) breach of contract as an intended third-party beneficiary of the contract between Wells Fargo and the United States Treasury pursuant to HAMP and 2MP; and (5) violation of the Due Process Clause of the Fifth Amendment. Gorbaty asserts four claims under New York law: (1) violation of the DPA; (2) breach of an implied covenant of good faith and fair dealing; (3) common law fraud; and (4) civil conspiracy to commit fraud. Gorbaty seeks, among other things, declaratory relief, an injunction preventing Wells Fargo "from continuing to harm Mrs. Gorbaty," "specific performance of [Wells Fargo's] contractual obligations," actual damages, attorney's fees and costs, statutory damages, punitive damages, and, with respect to the Equity Loan, rescission of the transaction. (Mortg. Compl. at 19-20; Equity Compl. at 25-26.) The two actions were consolidated on July 27, 2010, under Case Number 10-CV-3291. (Docket Entry # 3.)

---

[3]     The dates and details of the disclosures provided to Gorbaty and Gorbaty's informational inquiries will be set forth in the discussion of Gorbaty's legal claims. (See Part III, infra.)

On July 14, 2011, Wells Fargo moved to dismiss Gorbaty's Complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket Entry # 57.) The court referred the motion to Magistrate Judge Steven M. Gold for a Report and Recommendation ("R&R"). (Docket Entry # 49.) On November 29, 2011, Judge Gold recommended that the court grant Wells Fargo's motion to dismiss in its entirety with prejudice. (R&R (Docket Entry # 76).) Gorbaty timely objected to each section of the R&R (Docket Entry # 80), and Wells Fargo filed a response to Gorbaty's objections (Docket Entry # 81).

## II.    STANDARD OF REVIEW

Because Gorbaty objected to each portion of Judge Gold's R&R, the court reviews Gorbaty's claims de novo. See 28 U.S.C. § 636(b)(1).

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of a complaint under the "two-pronged approach" established by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). The court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. Iqbal, 129 S. Ct. at 1949. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. at 1950. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal quotation marks omitted). Plausibility "is not akin to a

probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks omitted).

Where a plaintiff proceeds pro se, the court reads his or her submissions liberally and interprets them as raising the strongest arguments they suggest.[4] See McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is because "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted). Even a pro se complaint, however, will be dismissed if it does not contain sufficient, plausible factual matter to state a claim. See Iqbal, 129 S. Ct. at 1949.

"A pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). But "leave to amend need not be given if the complaint does not indicate a valid claim may be stated." LaBounty v. Kinkhabwala, 2 Fed. Appx. 197, 200 (2d Cir. 2001). A "futile request to replead," even by a pro se litigant, "should therefore be denied." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

## III. DISCUSSION

### A. RESPA

RESPA was enacted to provide consumers "with greater and more timely information on the nature and costs of the settlement process and [to] protect[ them] from unnecessarily high

---

[4] Gorbaty filed her Complaints pro se but is now represented by counsel, namely her husband, Dmitry Gorbaty. Where a complaint is filed pro se but plaintiff was assisted by counsel in filing her opposition papers, "it is an open question whether the stricter standard governing dismissal of *pro se* complaints is appropriate." Braphman-Bines v. NYPD, No. 95-CV-7388 (KMK), 2005 WL 22843, at *2 (S.D.N.Y. Jan. 3, 2005). Because the complaint is the document under review at the motion to dismiss stage, the court concludes that a complaint filed pro se should be reviewed using the liberal standard despite the plaintiff's subsequent retention of counsel. See Kubicek v. Westchester County, No. 08-CV-372 (KMK), 2009 WL 3720155, at *3 n.5 (S.D.N.Y. Oct. 8, 2009). The court notes, however, "that now that [Kate Gorbaty] is formally represented by counsel, her future submissions will not be considered pro se." Id.

settlement charges caused by certain abusive practices," especially "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. §§ 2601(a), (b)(2). In accordance with this objective, RESPA requires a lender of any "federally related mortgage loan" to provide borrowers with two documents: (1) a Good Faith Estimate ("GFE") of the settlement costs the borrower is likely to incur, id. § 2604(c); and (2) a Uniform Housing and Urban Development Settlement Statement ("HUD-1") that "conspicuously and clearly itemize[s] all charges imposed upon the borrower,"[5] id. § 2603.

These provisions of RESPA, although important to understanding Gorbaty's claims, do not themselves provide a private cause of action, see 12 U.S.C. § 2614; Brophy v. Chase Manhattan Mortg. Co., 947 F. Supp. 879, 881-82 (E.D. Pa. 1996), nor does Gorbaty purport to be bringing claims pursuant to §§ 2603 or 2604. Thus, although Gorbaty's Mortgage Complaint alleges that she was never provided with an HUD-1 at closing with respect to her Mortgage Loan, and that the GFE Wells Fargo provided her contained terms different from her actual settlement costs (Mortg. Compl. ¶¶ 10-12, 15-16, 30, 36-37, 39, 46, 55, 56), her RESPA claims do not turn on these alleged actions.

Gorbaty brings claims pursuant to two other provisions of RESPA. First, under 12 U.S.C. § 2605, a borrower may submit to a servicer of a loan a "qualified written request" ("QWR") for "information related to servicing" of the loan. 12 U.S.C. § 2605(e)(1)(A). The statute defines a QWR as "written correspondence" that: (1) "includes, or otherwise enables a servicer to identify, the name and account of the borrower"; and (2) "includes a statement of the reasons for belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." Id. § 2605(e)(1)(B). When a

---

[5]     In Gorbaty's case, RESPA required Wells Fargo to provide these disclosures with respect to *both* the Mortgage Loan and Equity Loan. This is also true of other required disclosures discussed below.

borrower submits a QWR, the servicer must "acknowledge[] receipt of the correspondence within 20 days." Id. § 2605(e)(1)(A). Within sixty days, the servicer must either: (1) "make appropriate corrections in the account of the borrower"; (2) provide a written explanation for why the servicer believes the account is correct; or (3) provide "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." Id. § 2605(e)(2). RESPA provides that failure to comply with § 2605 will subject the servicer to liability for: (1) "any actual damages to the borrower as a result of the failure"; and (2) "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000." Id. § 2605(f)(1).

Gorbaty's second RESPA claim is brought under 12 U.S.C. § 2607, which prohibits any person from giving or accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." Id. § 2607(b). In other words, § 2607 prohibits "unearned fees" in connection with a real estate settlement. Cohen v. J.P. Morgan Chase & Co., 498 F.3d 111, 124-25 (2d Cir. 2007).

The court will address Gorbaty's § 2605 and § 2607 claims in turn. For the reasons that follow, Gorbaty's Complaints fail to state a claim under RESPA.

1.     Section 2605

Gorbaty alleges that Wells Fargo violated § 2605 of RESPA by failing to timely and properly respond to her QWRs for documentation concerning the Mortgage and Equity Loans.[6]

---

[6]     As Judge Gold noted, whether RESPA covers home equity loans is an unsettled issue. (See R&R at 22-23.) Because the court concludes that Gorbaty fails to state a RESPA claim for other reasons, the court will assume without deciding that RESPA applies to Gorbaty's Equity Loan.

(Mortg. Compl. ¶¶ 29-34; Equity Compl. ¶¶ 97-106.) With respect to her Mortgage Loan, Gorbaty alleges that on March 8, 2010, she sent Wells Fargo a QWR "request[ing] copies of the entire closing file for [her] loan," including a GFE, an HUD-1, and TILA disclosures,[7] as well as "a full payment history and any other documents showing loan disbursements, loan charges, payments made, and current principal balance due." (Mortg. Compl. ¶ 17, Ex. H.) According to Gorbaty, Wells Fargo responded on March 24, 2010, by providing Gorbaty with an HUD-1 and GFE that she had never seen before, and which both contained loan terms that were different from those disclosed in the GFE Wells Fargo provided to her at closing; it also provided an "incorrect TILA statement" that related to her Equity Loan rather than her Mortgage Loan. (Id. ¶ 19.) Gorbaty claims that on April 2, 2010, she sent a second QWR to Wells Fargo requesting an explanation of the discrepancies between the various disclosures, but Wells Fargo did not acknowledge receipt of that QWR or provide the requested information.[8] (Id. ¶¶ 20, 30-31.)

With respect to her Equity Loan, Gorbaty alleges that on March 8, 2010, she sent Wells Fargo a QWR requesting similar information to that which she requested for her Mortgage Loan. (Equity Compl. ¶ 16, Ex. D.) Wells Fargo failed to acknowledge her QWR within 20 days, so Gorbaty sent Wells Fargo a "Notice of Default" on May 12, 2010. (Id. ¶¶ 18, 100.) Wells Fargo responded to the QWR on May 24, 2010, by providing Gorbaty with: (1) the HUD-1 statement that she had been given at closing; (2) a GFE that she had never seen before and that was "general" rather than specific to her Equity Loan; and (3) a TILA statement that was different from the one she had received at closing. (Id. ¶¶ 19-20, 24, 101.) Gorbaty then sent Wells Fargo a second QWR on May 28, 2010, requesting clarification of the discrepancies between the TILA

---

[7]    As will be discussed below, TILA requires lenders to disclose to consumers various details such as finance charges, annual percentage rates of interest, and the borrower's right to rescind the transaction within a certain time period. (See Part III.B, infra.)

[8]    Gorbaty did not attach this QWR to her Mortgage Complaint.

8

statements and GFEs, but Wells Fargo failed to acknowledge receipt of her request or take any of the requested actions. (Id. ¶¶ 27, 103.)

Gorbaty's Complaints fail to state a § 2605 claim because they do not identify any damages she sustained as a result of Wells Fargo's alleged violations of § 2605. A plaintiff bringing a § 2605 claim must sufficiently allege one of two types of damages: (1) "actual damages to the borrower as a result of the failure" to comply with § 2605; or (2) statutory damages "in the case of a pattern or practice of noncompliance with the requirements" of § 2605.[9] 12 U.S.C. § 2605(f). The Complaints fail to sufficiently allege either kind of damages.

A plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA. See Gorham-DiMaggio v. Countrywide Home Loans, Inc., No. 08-CV-019 (LEK) (RFT), 2009 WL 1748743, at *8 (N.D.N.Y. June 19, 2009); Corazzini v. Litton Loan Servicing LLP, No. 09-CV-199 (MAD) (ATB), 2010 WL 6787231, at *12 (N.D.N.Y. June 15, 2010) ("[T]he courts have consistently dismissed complaints under RESPA if they do not allege actual damages or state merely that in a conclusory fashion the defendant caused damages to the plaintiff."); McLean v. GMAC Mortg. Corp., 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009). Importantly, "the loss alleged must be related to the RESPA violation itself." Yuhre v. JPMorgan Chase Bank, No. 09-CV-02369 (GEB) (JFM), 2010 WL 1404609, at *6 (E.D. Cal. Apr. 6, 2010).

---

[9]     It is not entirely clear whether RESPA permits a plaintiff to recover statutory damages without proving the existence of actual damages. RESPA permits damages equal to the "sum" of "actual damages" and "any *additional* damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section." 12 U.S.C. § 2605(f)(1) (emphasis added). The word "additional" suggests that RESPA might not permit recovery of statutory damages alone. But because the court concludes that Gorbaty has not sufficiently alleged a pattern or practice of noncompliance, it will for now assume without deciding that statutory damages are permissible under RESPA even absent a showing of actual damages. If Gorbaty amends her Complaints to sufficiently allege a pattern or practice of noncompliance, the court will discuss the issue more fully.

9

Gorbaty's Complaints contain only conclusory allegations that she has suffered actual damages, and no factual allegation suggesting that any damages she suffered were proximately caused by Wells Fargo's *violations of § 2605*. Gorbaty alleges that she "has suffered harm as a result of Defendant Wells Fargo['s] actions and omissions," that she is "on the verge of losing her house," and that she would have "walk[ed] away from the loan" if she had known the truth about its terms (Mortg. Compl. ¶¶ 27, 37; Equity Compl. ¶ 35), but she provides no factual allegation linking her alleged harms to Wells Fargo's failure to timely respond to her QWRs or its provision of loan documents that were inconsistent with documents she had received earlier. Similarly, in her objections to the R&R, Gorbaty discusses her "intense emotional distress over losing [her] home," and states that "her resources are exhausted after paying more than $100,000 over three years of mortgage payments on the house" (Pl. Obj. at 18), but she does not explain how these problems were caused specifically by Wells Fargo's alleged § 2605 violations.[10]

Gorbaty's Complaints also fail to sufficiently allege that she is entitled to statutory damages under § 2605. In order to obtain statutory damages, a plaintiff must establish "a pattern or practice of noncompliance with the requirements" of § 2605. 12 U.S.C. § 2605(f)(1). "Pattern or practice" means "a standard or routine way of operating." McLean, 595 F. Supp. 2d at 1365; cf. Newton v. United Cos. Fin. Corp., 24 F. Supp. 2d 444, 456 (E.D. Pa. 1998) (term

---

[10]     The court also notes that Gorbaty has not alleged any actual damages resulting from Wells Fargo's failure to properly *service* her loans. Section 2605 addresses only requests "for information relating to the servicing of [the] loan," with "servicing" defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. §§ 2604(i)(3), 2605(e)(1)(A); see also Gates v. Wachovia Mortg., FSB, No. 09-CV-02464 (FCD) (EFB), 2010 WL 2606511, at *3 (E.D. Cal. June 28, 2010) ("Courts routinely interpret section 2605 as requiring a QWR to relate the servicing of a loan, rather than the creation or modification of a loan."). Gorbaty's QWRs did request certain information related to servicing—"a full payment history and any other documents showing loan disbursements, loan charges, payments made, and current principal balance due"—and stated that "there were numerous errors made in the servicing of my account" (Mortg. Compl., Ex. H; Equity Compl., Ex D), but to the extent that Wells Fargo failed to comply with these parts of the QWRs, Gorbaty does not allege any harm flowing from those failures. If anything, Gorbaty's allegations of harm relate to Wells Fargo's alleged failures to provide proper *closing*-related documents, such as GFEs, HUD-1s, and TILA statements. (See, e.g., Mortg. Compl. ¶ 37.)

10

"pattern or practice" as used in TILA refers to "wide-ranging and institutionalized practices").

Here, two of the Defendants are alleged to have committed, at most, two violations of § 2605

each: Wells Fargo Home Mortgage allegedly failed to respond properly to Gorbaty's March 8,

2010, QWR, and to respond at all to Gorbaty's March April 2, 2010, QWR (Mortg. Compl.

¶¶ 17, 19-20, 30-31); Wells Fargo Home Equity allegedly failed to respond properly to

Gorbaty's March 8, 2010, QWR, and to respond at all to her May 28, 2010, QWR[11] (Equity

Compl. ¶¶ 16, 18, 19-20, 24, 101-03). Two violations do not qualify as a "standard or routine

way of operating," McLean, 595 F. Supp. 2d at 1365 (two violations of RESPA insufficient to

support claim for statutory damages), or a "wide-ranging and institutionalized practice[],"

Newton, 24 F. Supp. 2d at 456.

In sum, Gorbaty's Complaints as currently written fail to state a claim under § 2605 of

RESPA because they do not adequately allege actual or statutory damages. Gorbaty will,

however, be given leave to replead this claim. Should Gorbaty wish to pursue a claim under

§ 2605, she must allege additional facts sufficient to show either: (1) actual damages *resulting*

from Wells Fargo's failure to properly respond to her QWRs and which relate to the *servicing* of

her loans; or (2) that Wells Fargo has a "pattern of practice" of noncompliance with § 2605,

which requires more than two violations per Defendant.

### 2. Section 2607

Gorbaty alleges that Wells Fargo violated § 2607 of RESPA by giving its mortgage

broker, American Mortgage Company, a $2,760 loan discount and a $2,036 mortgage broker

commission, which Gorbaty claims constitute "unlawful and unearned fee splitting and

kickback[s]." (Mortg. Compl. ¶ 16, Ex. B.) She claims that she did not know about these fees

---

[11] As Judge Gold pointed out (see R&R at 24 n.19), Wells Fargo Home Mortgage and Wells Fargo Home Equity must be considered separate alleged violators of RESPA even though they are both subsidiaries of Wells Fargo Bank, N.A., because they are separate corporate entities with principal places of business in different states.

until they appeared on the HUD-1 that she received from Wells Fargo in response to one of her March 8, 2010 QWRs, which, as discussed above, she alleges that she did not receive at closing. (Id. ¶¶ 10, 16, 36-37.) Gorbaty also alleges that the charges did not appear on the GFE with respect to her Mortgage Loan that she received prior to closing. (Id. ¶ 16.)

Gorbaty's allegations are too vague and conclusory to state a claim under § 2607. The Mortgage Complaint simply asserts, without any factual support, that the two fees disclosed in the HUD-1 qualify as "unlawful and unearned fee splitting and kickback[s]." (Id.) It is unclear why Gorbaty believes that these fees were "unearned," see 12 U.S.C. § 2607(b) (excluding from its coverage fees "for services actually performed"); Cohen, 498 F.3d at 124-25 (section 2607 prohibits only "unearned fees"), or why she believes that they were *referral* fees, see 12 U.S.C. § 2607(a) (section entitled "Business referrals" that prohibits "any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan *shall be referred to any person*" (emphasis added)). Indeed, Gorbaty appears to assume that the fees she identifies violate § 2607 simply because they were disclosed in the HUD-1 but not in either of the GFEs she received. Of course, that by itself does not make them "unearned fees" or "kickbacks," and Gorbaty's allegations labeling them as such are insufficient to state a claim. See Iqbal, 129 S. Ct. at 1950 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss).

Thus, Gorbaty's allegations with respect to § 2607 are currently too vague and conclusory to state a claim. Gorbaty will be given leave to replead this claim. Should Gorbaty wish to pursue a claim under § 2607, she must allege additional facts sufficient to show that the fees identified in Paragraph 16 of her Mortgage Complaint either: (1) were business referral

12

fees, see 12 U.S.C. § 2607(a); or (2) were not "for services actually performed," id. § 2607(b). The court notes that whether these fees were disclosed to Gorbaty prior to closing has nothing to do with the merits of her § 2607 claim.[12]

### B.    TILA

Whereas RESPA is directed toward protecting consumers in the mortgage settlement process specifically, TILA applies to consumer credit transactions more generally. TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit practices." 15 U.S.C. § 1601(a). Thus, TILA requires various disclosures, set forth in 15 U.S.C. § 1638, "of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." Beach v. Ocwen Fed. Bank., 523 U.S. 410, 412 (1998). Disclosures pursuant to TILA are generally provided to the consumer on a Truth in Lending Disclosure Statement ("TILDS").

TILA provides a cause of action for consumers to obtain actual or statutory damages for a creditor's failure to comply with its disclosure requirements. See 15 U.S.C. § 1640(a). And for certain kinds of transactions, TILA provides consumers with a "right to rescind the transaction" until the later of: (1) three days following the consummation of the transaction; or (2) the time of delivery of forms for the consumer to exercise the right to rescind, for a period of up to three

---

[12]    The alleged nondisclosure of the fees is, however, important to whether Gorbaty's claim is time-barred by § 2607's one-year statute of limitations. See 12 U.S.C. § 2614. Judge Gold recommended that Gorbaty's § 2607 claim be dismissed as untimely. (R&R at 13-18.) Gorbaty objects to this recommendation, arguing that the statute of limitations should be equitably tolled. (Pl. Objections at 12-13.) This issue need not be resolved unless Gorbaty can state a plausible claim under § 2607. If Gorbaty amends her Mortgage Complaint to make a plausible claim that Wells Fargo violated § 2607, the court will consider more fully the issue equitable tolling, which has been fully briefed by the parties.

13

years. 15 U.S.C. § 1635(a), (f). TILA requires creditors to "clearly and conspicuously disclose" the consumer's right of rescission. Id. § 1635(a).

Gorbaty asserts three claims under TILA, one with respect to her Mortgage Loan and two with respect to her Equity Loan. First, she alleges that Wells Fargo never provided her with any TILDS at all for her Mortgage Loan. (Mortg. Compl. ¶ 45.) Second, she alleges that although she was provided with a TILDS for her Equity Loan, that TILDS contained different terms from those of the loan she ultimately received, and that Wells Fargo failed to disclose the alleged change in its terms. (Equity Compl. ¶ 45.) Third, Gorbaty claims that the TILDS she was provided for her Equity Loan failed to inform Gorbaty of her right of rescission. (Id. ¶ 42.)

### 1.    Failure to Provide TILDS for Mortgage Loan

Gorbaty alleges that Wells Fargo failed to provide her with any TILDS for her Mortgage Loan prior to closing. (Mortg. Compl. ¶ 45.) This claim, however, is barred by TILA's statute of limitations.

An action under TILA must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). "A TILA violation occurs on 'the date of the consummation of the transaction.'" Madrid v. J.P. Morgan Chase Bank, N.A., No. 09-cv-00731 (JAM) (GGH), 2009 WL 3255880, at *2 (E.D. Cal. Oct. 8, 2009) (quoting King v. California, 784 F.2d 910, 915 (9th Cir. 1986)). Gorbaty does not dispute that her claim is untimely because the closing for both the Mortgage and Equity Loans occurred on July 23, 2007, and Gorbaty did not file the Mortgage Complaint until July 16, 2010. She argues, however, that her claim should be equitably tolled until March 24, 2010, the date that Wells Fargo provided her with the TILDS in response to her first QWR regarding her Mortgage Loan. (Mortg. Compl. ¶ 46.)

14

"Equitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) (internal quotation marks, alterations, and citation omitted). That is "generally" the case "where plaintiff was unaware of his or her cause of action due to misleading conduct of the defendant." Id. To determine whether to apply equitable tolling, a "district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Id. at 80-81 (internal quotation marks omitted). The "burden of proving that tolling is appropriate rests on the plaintiff." Chapman v. Choice-Care Long Island Term Disability Plan, 288 F.3d 506, 512 (2d Cir. 2002).

Courts have held that "[i]n a TILA . . . case, equitable tolling will not be applied unless the plaintiff alleges affirmative acts of concealment by the defendant over and above any alleged non-disclosure that forms the basis of her claims." Futterman v. Wash. Mut. Bank, No. 10-CV-01002 (LEK) (DRH), 2010 WL 5067650, at *2 (N.D.N.Y. Dec. 6, 2010); see also Williams v. Aries Fin., LLC, No. 09-CV-1816 (JG) (RML), 2009 WL 3851675, at *7 (E.D.N.Y. Nov. 18, 2009) ("'[T]he courts have held uniformly that fraudulent conduct beyond the nondisclosure itself is necessary to equitably toll the running of the statute of limitations.'" (quoting Cardiello v. Money Store, Inc., No. 00-CV-7332 (NRB), 2001 WL 604007, at *5 (S.D.N.Y. June 1, 2001), aff'd, 29 Fed. Appx. 780 (2d Cir. Mar. 15, 2002))). "This rule is intended to avoid rendering the statute of limitations meaningless. If nondisclosure tolled the statute of limitations for a claim brought based on nondisclosure, the statute of limitations would have no effect." Futterman, 2010 WL 5067650, at *2 (internal quotation marks omitted). Thus,

in addition to the acts giving rise to the TILA claim, "the plaintiff must identify 'some trick or contrivance intended to exclude suspicion and prevent inquiry.'" Id. (quoting Moll v. U.S. Life Title Ins. Co. of N.Y., 700 F. Supp. 1284, 1291 (S.D.N.Y. 1988)); see also McAnaney v. Astoria Fin. Corp., No. 04-CV-1101 (JFB) (WDW), 2007 WL 2702348, at *7 (E.D.N.Y. Sept. 12, 2007).

As noted above, the basis of Gorbaty's TILA claim is that she was not provided with a TILDS with respect to her Mortgage Loan prior to closing. (Mortg. Compl. ¶ 45.) Accepting this allegation as true, Gorbaty should have been aware of this claim at the time of closing in 2007, especially since she admittedly did receive a TILDS with respect to her *Equity* Loan prior to the closing. (See Equity Compl. ¶¶ 11-12.) Yet she did not even attempt to obtain a TILDS with respect to her Mortgage Loan until March 8, 2010, the date that she sent Wells Fargo a QWR requesting the TILDS. (Mortg. Compl. ¶ 17, Ex. H.) And crucially, Gorbaty has not alleged an "affirmative act[]of concealment by [Wells Fargo] over and above" the non-disclosure itself that would have prevented her from discovering that Wells Fargo had not provided her with the TILDS prior to closing. Futterman, 2010 WL 5067650, at *2; see also Williams, 2009 WL 3851675, at *7. Gorbaty does indeed allege that Wells Fargo fraudulently provided her with a number of contradictory and inaccurate documents (see Mortg. Compl. ¶ 46; Pl. Obj. at 12-13), but none of these documents should have reasonably prevented her from discovering *the fact of nondisclosure* of the TILDS.[13]

Thus, no "exceptional circumstances" warrant application of equitable tolling to Gorbaty's claim that Wells Fargo failed to provide her with a TILDS with respect to her Mortgage Loan. Zerilli-Edelglass, 333 F.3d at 80. That claim will be dismissed unless Gorbaty

---

[13] As will be discussed below, however, these documents are important to the court's analysis of whether equitable tolling should be applied to one of Gorbaty's TILA claims with respect to her Equity Loan. (See Part III.B.2, infra.)

16

amends her Mortgage Complaint to sufficiently allege that Wells Fargo committed an affirmative act of concealment preventing her from discovering Wells Fargo's alleged nondisclosure.

### 2. Failure to Disclose Change in Terms of Equity Loan

Next, Gorbaty alleges that, although she was provided with a TILDS for her Equity Loan, the TILDS contained different terms from those of the loan she ultimately received. (Equity Compl. ¶ 45.) In particular, Gorbaty alleges that the TILDS she received for her Equity Loan stated that her loan payments were to be made over thirty years, but then Wells Fargo "drastically changed the terms of the loan" to require fifteen years of payments with a balloon payment due at the end of the fifteen-year period, and failed to disclose this change in terms. (Id.) Wells Fargo argues that Gorbaty's claim must be dismissed both on statute limitations grounds and for failure to state a TILA claim. (Def. Mem. (Docket Entry # 58) at 8-12.) The court will address the merits of Gorbaty's claim first, as the court's analysis of the merits is important to its analysis of the statute of limitations issue. For the reasons that follow, Gorbaty has stated a claim under TILA that is not barred by the statute of limitations.

### a. *Failure to State a Claim*

Gorbaty attaches to her Equity Complaint the TILDS that she allegedly received on June 28, 2007, regarding her Equity Loan (the "TILDS-1").[14] (Equity Compl., Ex. A.) The TILDS-1 disclosed that Gorbaty would make 359 payments of $555.19 and one payment of $555.10. (Id.) According to Gorbaty, that "is exactly what [she] agreed [to pay]: a fixed 30 year, 360 month loan." (Id. ¶ 12.) The GFE she received that day with respect to her Equity Loan also states that Gorbaty would make 360 payments on the loan. (Id., Ex. C.)

---

[14] The court may consider documents attached to Gorbaty's Complaints in ruling on this motion to dismiss. See Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999).

In response to one of her QWRs, however, Wells Fargo sent Gorbaty a TILDS on May 24, 2010, stating that Gorbaty would make 179 payments and one final balloon payment of $55,496.28—i.e., a fifteen-year loan (the "TILDS-2"). (Id., Ex. H.) Gorbaty alleges that she "never agreed to these terms," that she "never signed or [saw] this [TILDS] prior to May 24th, 2010," and that she would have "walk[ed] away from the transaction if th[ese] were the terms." (Id. ¶ 20; see also id. ¶ 22.) Although the TILDS-2 contains Gorbaty's signature (and that of her husband) dated July 23, 2007 (id., Ex. H), Gorbaty claims that Wells Fargo fabricated this signature (id. ¶¶ 21, 45). In particular, the TILDS-2 contains two pages—a page containing the loan information and a page containing only signatures—and Gorbaty alleges that she signed a signature page attached to the "correct document"—the TILDS-1—and "later the [signature][15] page of the [TILDS-1] was substituted to the undisclosed and fraudulent version [the TILDS-2]." (Id. ¶ 21.)

Wells Fargo provides—with its motion to dismiss—what it claims to be the mortgage and note for the Equity Loan, which states that Gorbaty will make fifteen years of monthly payments of $557.42 ending with a "final balloon payment equal to the unpaid Principal plus all remaining interest, fees and other sums owed" under the Equity Loan. (Estes Decl., Ex. B (Docket Entry # 59-3) at 16.) This document also contains a signature allegedly made by Gorbaty (see id. at 21), but Gorbaty disputes the validity of this signature as well and claims she was never provided with the mortgage and note submitted by Wells Fargo (Pl. Obj. at 5-6, 9).

To summarize, four main documents are potentially at issue with respect to this claim: (1) the TILDS-1 provided to Gorbaty on June 28, 2007, which states that Gorbaty would be

---

[15] Gorbaty's Equity Complaint actually states that the "*first* page of the [TILDS-1] was substituted to the undisclosed and fraudulent version." (Equity Compl. ¶ 21 (emphasis added).) Since it is clear that the TILDS-2 does not contain the first page of the TILDS-1, the court assumes that this is a typo and that Gorbaty meant to allege that the second (signature) page of the TILDS-1 was fraudulently appended to the back of the TILDS-2.

receiving a thirty-year loan; (2) the GFE provided to Gorbaty on June 28, 2007, which also states that Gorbaty would be receiving a thirty-year loan; (3) the TILDS-2 that Gorbaty claims she did not receive until May 24, 2010, which states that Gorbaty would be receiving a fifteen-year loan with a balloon payment; and (4) the mortgage and note provided with Wells Fargo's motion to dismiss, which Gorbaty claims she never received and which states that Gorbaty would be receiving a fifteen-year loan with a balloon payment.

Gorbaty claims that the TILDS-1 and GFE reflected the true terms of the Equity Loan to which Gorbaty agreed, but that after providing her with those documents, Wells Fargo "drastically changed the terms of the loan"—from a thirty-year loan to a fifteen-year loan—and "failed to disclose" those new terms in the form of a revised TILDS.[16] Gorbaty claims that Wells Fargo's change in the terms of the loan without disclosure violates various provisions of TILA, including TILA's requirements to accurately disclose the "amount financed," 15 U.S.C. § 1638, the "finance charge," id. § 1638(a)(3), the "annual percentage rate," id. § 1638(a)(4), the "total of payments," id. § 1638(a)(5), and the "number, amount, and due dates or period of payments scheduled to repay the total of payments," id. § 1638(a)(6). (Equity Compl. ¶ 45.) She asserts that these violations entitle her to damages under 15 U.S.C. § 1640(a). (Id. ¶ 53.)

Wells Fargo argues that Gorbaty's allegations are "flatly contradicted by the documentary evidence" because "Gorbaty "signed the [TILDS-2], dated July 23, 2007, and in doing so acknowledged that she 'received a *completed copy* of this Truth in Lending Disclosure Statement.'" (Id. at 12 (quoting Estes Decl., Ex. D).) Wells Fargo further asserts that Gorbaty's

---

[16]     It is important to note that Gorbaty cannot claim that Wells Fargo's provision of the TILDS-1 violated TILA because she alleges that the terms of that TILDS were *accurate*—that is, according to Gorbaty, the TILDS-1 correctly disclosed the terms of the Equity Loan as agreed upon by Gorbaty. (See Equity Compl. ¶¶ 45, 53.) Gorbaty's TILA claim must be based, if anything, on Wells Fargo's failure to disclose the alleged *change* in the terms of the Equity Loan by failing to provide Gorbaty with a *new* TILDS after it changed those terms at some point between the provision of the TILDS-1 and the closing. Gorbaty's Equity Complaint does indeed make such an allegation. (See, e.g., id. ¶¶ 45, 53-54, 56.)

allegation that the second page of the TILDS-2 was obtained fraudulently is "rebutted by the documentary evidence, as the Promissory Note for her Equity Loan . . . shows that she agreed to a final balloon payment." (Def. Reply (Docket Entry # 69) at 2.) Put more simply, Wells Fargo's theory is that Gorbaty's TILA nondisclosure claim is precluded by Gorbaty's signature of (1) the mortgage and note and (2) the TILDS-2, both of which provided for a fifteen-year loan with a final balloon payment. The court concludes, however, that it may not rely upon either of these documents to resolve this claim in favor of Wells Fargo.

First, the court may not consider the mortgage and note. Upon a motion to dismiss, a court may generally consider documents submitted by a defendant that are "integral to the complaint," Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted), but even integral documents may not be considered if there is a dispute "regarding the authenticity or accuracy of the document," Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). Gorbaty "dispute[s] the authenticity" of the mortgage and note and asserts that these documents were not provided to her at closing.[17] (Pl. Obj. at 5; see also id. at 6, 11, 16.) Thus, the court may not consider them.

---

[17]    Judge Gold found that Gorbaty "in essence conceded" at oral argument "that she executed the notes and mortgages submitted by" Wells Fargo, and that therefore "the authenticity of these documents is not genuinely disputed." (R&R at 12.) At oral argument before Judge Gold, Kate Gorbaty's husband and counsel, Dmitri Gorbaty, stated that the mortgage and note were "not given to us when we had the closing"; however, when asked whether Kate Gorbaty signed the documents at closing, Dmitry Gorbaty stated, "Yes[, i]f it has the signature, then it is the signature"; and when asked whether "Ms. Gorbaty claim[ed] that any of her signatures were forged," Dmitry Gorbaty stated, "[t]here's no such claim in the complaint." (Tr. of Nov. 14, 2011 at 18-19.) Although this exchange could be interpreted as a concession that Kate Gorbaty signed the documents submitted by Wells Fargo, the court gives less weight to Dmitry Gorbaty's vague and somewhat confused response than to the far clearer statements in the written objections to the R&R (made after oral argument) that Kate Gorbaty disputes the authenticity, accuracy, and receipt of the mortgage and note. (See Pl. Objections at 5-6, 11, 16.) The court certainly disagrees with Dmitry Gorbaty's shamefully frivolous suggestions that Judge Gold improperly "cross-examin[ed]" him at oral argument based on bias and animosity toward his wife (id. at 16), but nonetheless concludes that Dmitry Gorbaty's statements should not be used to resolve the authenticity of the mortgage and note in favor of Wells Fargo at the motion to dismiss stage.

20

Second, the court may not take into account Gorbaty's apparent signature of the TILDS-2. The court accepts as true Gorbaty's allegation that she did not receive the TILDS-2 until May 2010, and that Wells Fargo created a false signature page in order to make it appear that Gorbaty signed the TILDS-2 on July 23, 2007. (Equity Compl. ¶¶ 21-22, 45.)

Wells Fargo does not dispute that, taking these documents out of the picture, Gorbaty has stated a claim under TILA by alleging that Wells Fargo failed to disclose the change in the terms of her Equity Loan. Indeed, Wells Fargo does not appear to dispute that Gorbaty was provided with the TILDS-1, that the TILDS-1 contains terms that were materially different from both the TILDS-2 and the loan that she ultimately received, and that the GFE aligns with the TILDS-1 rather than Gorbaty's actual Equity Loan. Discovery is necessary to sort out these troubling discrepancies. Thus, Gorbaty has stated a claim under TILA.

b.     *Statute of Limitations*

Because the closing for the Equity Loan occurred on July 23, 2007, and because Gorbaty did not file her Equity Complaint until July 16, 2010, her TILA nondisclosure claim with respect to her Equity Loan is untimely. See 15 U.S.C. § 1640(e). Gorbaty does not dispute that her claim is untimely but asserts that equitable tolling should be applied until May 24, 2010, when Gorbaty received the TILDS-2 in response to her QWR. (See Equity Compl. ¶¶ 54, 56, 59.) The court agrees.

Assuming the veracity of Gorbaty's allegations that Wells Fargo changed the terms of her Equity Loan from those disclosed in the TILDS-1 and never informed Gorbaty of that fact, Gorbaty could not have reasonably discovered the existence of her TILA claim until she saw the TILDS-2 and its inconsistent terms in May 2010. On the other hand, it is true that Gorbaty technically has not alleged "an affirmative act[] of concealment by [Wells Fargo] over and above

any non-disclosure" during the limitations period; and under the normal rule applied by courts to have addressed the issue, Gorbaty's failure to make this allegation would foreclose the application of equitable tolling. Futterman, 2010 WL 5067650, at *2; see also Williams, 2009 WL 3851675, at *7; Cardiello, 2001 WL 604007, at *5.

The court holds, however, that the normal rule applicable to equitable tolling of TILA claims does not apply where, as here, the plaintiff has alleged a failure to provide a *revised* TILDS reflecting a *change* in the terms of the loan of which the plaintiff had no reason to be aware. Despite the lack of any additional "trick or contrivance" beyond the nondisclosure itself, Futterman, 2010 WL 506750, Gorbaty would have had no reason at all to investigate the nondisclosure until May 2010 because, according to her: (1) the terms set forth in the TILDS-1 and the GFE aligned with her understanding of the actual terms of the Equity Loan; and (2) Wells Fargo never informed her of the change in those terms.[18] Cf. Madrid, 2009 WL 3255880, at *3 (applying equitable tolling where "Plaintiff allege[d] that she received the note and two [TILDS] on the same day that contained contradictory terms and did not clearly and conspicuously disclose the terms of her loans," thus "mak[ing] plausible Plaintiff's inability to discover the alleged disparity between the disclosure documents and the actual terms of her loan"). Therefore, the court concludes that equitable tolling is appropriate here. See Huynh v. Chase Manhattan Bank, 465 F.3d 992, 1003-04 (9th Cir. 2006) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss . . . if equitable tolling is at issue."); Zerilli-Edelglass, 333 F.3d

---

[18]     Judge Gold concluded that because Gorbaty signed the mortgage and note submitted by Wells Fargo at closing, "the disparity between the terms disclosed in the TILDS and the terms of the note and mortgage should have been immediately apparent to a reasonably diligent borrower" at that time. (R&R at 18.) Similarly, Wells Fargo argues that the equitable tolling does not apply because Gorbaty signed the TILDS-2 on July 23, 2007. (Def. Mem. at 10.) As discussed above, however, the court may not consider either the mortgage and note submitted by Wells Fargo or the signature page and date of the TILDS-2. (See Part III.B.2.a, supra.)

at 80 (equitable tolling is "generally" applicable "where plaintiff [i]s unaware of his or her cause of action due to misleading conduct of the defendant").

In sum, although Gorbaty's claim regarding the nondisclosure of the alleged change in the terms of her Equity Loan is untimely, the court finds—accepting Gorbaty's allegations as true and disregarding documents submitted by Wells Fargo whose authenticity is in dispute— that the claim should be equitably tolled until May 24, 2010, and thus is not barred by the statute of limitations. As the factual record pertaining to Gorbaty's knowledge at the time of closing is developed, Wells Fargo may raise again its statute of limitations defense in a subsequent motion.

### 3. Failure to Disclose the Right of Rescission

Gorbaty's final TILA claim is that the TILDS she was provided for her Equity Loan failed to inform her of her right of rescission. (Equity Compl. ¶¶ 42-44.) The court holds, however, that Gorbaty did not have such a right.

As discussed above, TILA provides consumers with a "right to rescind the transaction" until the later of three days following the consummation of the transaction or the time of delivery of forms for the consumer to exercise the right to rescind, for a period of up to three years; and requires creditors to "clearly and conspicuously disclose" the consumer's right of rescission. 15 U.S.C. § 1635(a), (f). However, TILA exempts from its application "a residential mortgage transaction as defined in section 1602(w) of this title." Id. § 1635(e)(1). TILA defines "residential mortgage transaction" as a "transaction in which a *mortgage*, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained *against the consumer's dwelling to finance the acquisition or initial construction of such dwelling*." Id. § 1602(w) (emphases added).

Thus, if Gorbaty's Equity Loan qualifies as a "mortgage . . . created or retained against [Gorbaty's] dwelling to finance the acquisition or initial construction of such dwelling," then she did not have a right to rescind the transaction for her Equity Loan and Wells Fargo was not required to provide her with any notice of a right to rescind. Id. There is no dispute that Gorbaty's Equity Loan was "created or retained against [Gorbaty's] dwelling to finance the acquisition or initial construction of such dwelling." 15 U.S.C. § 1602(w). Gorbaty argues, however, that the Equity Loan is not a "mortgage but an equity product and is treated by defendant as an equity product." (Pl. Obj. at 21.) The court disagrees.

Although TILA does not provide a definition of "mortgage," the dictionary defines the term as "a conveyance or lien against property that is defeated upon payment or performance according to stipulated terms." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 758 (10th ed. 1999); see also BLACKS LAW DICTIONARY 1031 (8th ed. 1999) ("A conveyance of title to property that is given as security for the payment of a debt or the performance of a duty and that will become void upon payment or performance according to the stipulated terms."). Gorbaty's Equity Loan, secured at the same time as her Mortgage Loan, meets these definitions; it is a lien against Gorbaty's property that is defeated upon the completion of Gorbaty's payments. Indeed, home equity loans are often referred to as "second mortgages," see, e.g., Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 75 (2004) (referring to "second mortgages (or home equity loans)"); In re Dziendziel, 295 B.R. 184, 186 (Bankr. W.D.N.Y. 2003) (referring to a "home equity loan second mortgage" on a residence), and Gorbaty's own Equity Complaint repeatedly refers to the Equity Loan as a "mortgage"[19] (see, e.g., Equity Compl. ¶ 5 (stating that this action

---

[19] Gorbaty's vague and conclusory assertions in her opposition papers that Wells Fargo "considers this loan as [a] credit transaction and not [a] mortgage," and does "not use 'mortgage' but 'equity' language" with respect to equity loans (Pl. Opp'n (Docket Entry # 66) at 9), do not seriously call into question the characterization of the

24

"arises in connection with an abusive and predatory home mortgage loan"), ¶ 8 ("Gorbaty

received a home equity loan from Wells Fargo Home Equity that was secured by [a] mortgage

against Mrs. Gorbaty's home . . . ."), ¶ 9 ("The original and principal amount of the new

mortgage loan was $69,000 . . . ."), ¶ 10 ("Mrs. Gorbaty's mortgage is a 'federally related

mortgage loan' as defined in 12 U.S.C. § 2602(1) . . . .")).

TILA's legislative history confirms that a home equity loan is exempted from the right of

rescission. Prior to an amendment in 1980, 15 U.S.C. § 1635(e) provided that the right of

rescission "[did] not apply to the creation or retention of a *first* lien against a dwelling to finance

the acquisition of that dwelling," and thus "on its face distinguish[ed] between the first mortgage

transaction and the second mortgage transaction." Arnold v. W.D.L. Invs., Inc., 703 F.2d 848,

851 (5th Cir. 1983). The fact that Congress specifically eliminated the distinction between first

and second mortgages in 1980 and broadly exempted "residential mortgage transaction[s]"

suggests that it intended to sweep second mortgages into the TILA exemption as well.[20]

In sum, because Gorbaty's Equity Loan is "a residential mortgage transaction" under

TILA, it is not subject to TILA's right of rescission. 15 U.S.C. § 1635(e)(1). Accordingly,

Wells Fargo had no obligation to inform Gorbaty of any such right. And because home equity

loans secured against property meet the legal definition of "residential mortgage transaction"

under TILA, any amendment to Gorbaty's Equity Complaint with respect to her rescission claim

---

Equity Loan as a "mortgage." Nor does it matter if Wells Fargo processes equity loans "differently by a Home Equity division distinct from residential mortgage loans." (Id.)

[20] At least one case from this Circuit supports the proposition that home equity loans are treated the same way as traditional mortgages for the purposes of TILA and are thus exempt from TILA's right of rescission. See Ng v. HSBC Mortg. Corp., No. 07-CV-5434 (RRM) (VVP), 2010 WL 889256, at *2, *5 (E.D.N.Y. Mar. 10, 2010) (TILA's right of rescission did not apply to home equity loan). The cases Gorbaty cites (see Pl. Opp'n at 9) are not to the contrary. Horton v. California Credit Corp. Retirement Plan, No. 09-CV-274 (IEG) (NLS), 2009 WL 700223 (S.D. Cal. Mar. 16, 2009), involved a second lien loan that was *not* used to finance the acquisition of a dwelling but to "pay homeowner's dues and satisfy a personal judgment," id. at *1, and was therefore not exempted from the right of rescission for that reason, see id. at *3. And Arnold, also cited by Gorbaty, involved a transaction that occurred in 1977 and was thus not subject to the 1980 amendments to TILA discussed above. See id. at 851.

would be futile; this claim is therefore dismissed with prejudice. See LaBounty, 2 Fed. Appx. at 200; Cuoco, 222 F.3d at 112.

## C. HOEPA

HOEPA is a 1994 amendment to TILA that applies specifically to "high rate mortgages" and requires that certain additional, conspicuous disclosures be given with respect to such mortgages at least three days before the transaction is consummated. 15 U.S.C. §§ 1602, 1639. Gorbaty alleges that her Equity Loan qualifies as a "high rate mortgage" within the meaning of HOEPA and that Wells Fargo failed to make certain disclosures that HOEPA requires. (Equity Compl. ¶¶ 65-73.) This claim fails for the same reason as Gorbaty's third TILA claim (see Part III.B.3, supra): like TILA's right of rescission, HOEPA does not apply to "residential mortgage transactions," including Gorbaty's Equity Loan.[21] 15 U.S.C. § 1602(bb)(1), (w); see also Ng v. HSBC Mortg. Corp., No. 07-CV-5434 (RRM) (VVP), 2010 WL 889256, at *8 (E.D.N.Y. Mar. 10, 2010). Gorbaty will not be granted leave to replead this claim because any such leave would be futile; the claim is dismissed with prejudice. See LaBounty, 2 Fed. Appx. at 200; Cuoco, 222 F.3d at 112.

## D. Breach of Contract Related to HAMP and 2MP

Gorbaty asserts a claim for breach of contract as an intended third-party beneficiary of the contract between Wells Fargo and the United States Treasury pursuant to the HAMP and, with respect to her Equity Loan, 2MP. (Mortg. Compl. ¶¶ 61-65; Equity Compl. ¶¶ 108-15.) Specifically, Gorbaty alleges that she "clearly and continually qualified for loan modification under [HAMP] . . . , and despite that her four loan modification applications under HAMP

---

[21] The court need not decide whether the Equity Loan qualifies as a "high rate mortgage" under HOEPA—an issue that is also in dispute.

. . . were denied five time[s] without [a] verbal explanation, written explanation or possibility of appeal." (Mortg. Compl. ¶ 22; see also id. ¶ 64.) Gorbaty's allegations fail to state a claim.

HAMP is a federal program established by the Department of Treasury in 2009 pursuant to the Emergency Economic Stabilization Act of 2008. See Rivera v. Bank of Am. Home Loans, No. 09-CV-2450 (LB), 2011 WL 1533474, at *1 (E.D.N.Y. Apr. 21, 2011). It was "designed to help three to four million financially struggling homeowners by modifying loans to a level that is affordable for borrowers." Id. "HAMP provides financial incentives to loan servicers and investors to encourage them to modify the terms of existing private mortgages where foreclosures may be avoidable and modification is in the financial interests of the involved parties." Phu Van Nguyen v. Bank of Am. Home Loan Servs., LP, No. 10-CV-01712 (RMW), 2010 WL 3894986, at *1 (N.D. Cal. Oct. 1, 2010) (footnote omitted). 2MP is a sub-program of HAMP that provides for modifications of second mortgages in tandem with HAMP.[22]

The Treasury has retained the Federal National Mortgage Association ("Fannie Mae") as its financial agent to administer HAMP. Id. In this capacity, Fannie Mae enters into contracts with individual loan servicers "to perform loan modification services in exchange for financial incentives." Hoffman v. Bank of Am., No. 10-CV-2171 (SI), 2010 WL 2635773, at *1 (N.D. Cal. June 30, 2010). "Servicer participation in HAMP is completely voluntary." Phu Van Nguyen, 2010 WL 3894986, at *2. "Those servicers who elect to participate enter into contracts—known as Servicer Participation Agreements ('SPAs')—with Fannie Mae as the financial agent of the Treasury." Id. By entering into an SPA, the servicers "commit to perform loan modification pursuant to the Program Guidelines," which "establish a number of initial

---

[22]     The court will discuss Gorbaty's claims in terms of HAMP, but because 2MP is a sub-program of HAMP, and the first criterion for eligibility under 2MP is a modification of the borrower's primary mortgage under HAMP, the same analysis applies to both provisions.

criteria for a loan to be eligible for HAMP modification." Id. But "these initial eligibility requirements do not automatically qualify a borrower for HAMP modification. After a servicer verifies initial eligibility, the [Program] Guidelines further require the servicer to evaluate the loan to determine whether a HAMP modification is required." Id. On April 13, 2009, Wells Fargo entered into an SPA with Fannie Mae pursuant to HAMP. See Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008, Marques v. Wells Fargo Home Mortg., No. 09-CV-1985 (RBB), 2010 WL 3212131, at *1 (S.D. Cal. Aug. 12, 2010) ("Wells Fargo SPA").[23]

HAMP does not provide a private cause of action, see Phipps v. Wells Fargo Bank, N.A., No. 10-CV-2025 (LJO) (SKO), 2011 WL 302803, at *9 (E.D. Cal. Jan. 27, 2011), nor does Gorbaty claim that she was a party to the SPA. Rather, Gorbaty asserts that she may enforce the SPA as an intended third-party beneficiary. (Mortg. Compl. ¶¶ 61-65; Equity Compl. ¶¶ 108-15; Pl. Opp'n at 17-18.) "With very few exceptions, almost all federal courts to have addressed this precise issue have rejected borrows' claims to enforce the Servicer Participation Agreements as third party beneficiaries."[24] Rivera, 2011 WL 1533474, at *6 (collecting cases); see, e.g.,

---

[23]     "A court may [ ] take judicial notice of the status of other lawsuits in other courts and the substance of papers filed in those actions." Sawabeh Info. Servs. Co. v. Brady, ___ F. Supp. 2d ___, No. 11-CV-4164 (SAS), 2011 WL 6382701, at *6 (S.D.N.Y. Dec. 16, 2011); see also Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (court may take judicial notice of publicly filed documents "on a Rule 12(b)(6) motion only to determine *what* the documents stated, and *not to prove the truth of their contents*" (internal quotation marks omitted)).

[24]     The cases standing for the contrary proposition either contain very little analysis or made very preliminary observations that the plaintiff might be able to enforce the SPA as a third-party beneficiary. See, e.g., Sampson v. Wells Fargo Home Mortg., Inc., No. 10-CV-8836 (DDP), 2010 WL 5397236, at *3 (C.D. Cal. Nov. 19, 2010) (granting ex parte application for TRO because "[i]t seem[ed] logical to the court that the intended beneficiaries of [the SPA], whose objective is to modify mortgages and prevent foreclosures, are homeowners at risk of foreclosure"); Marques, 2010 WL 3212131, at *6 (noting that "Plaintiff may be able to state a claim against Defendant as an intended beneficiary of the [SPA]," but holding that "because Plaintiff did not allege whether he contacted Defendant in reference to [his] modification and because it [wa]s unclear from the allegations whether Defendant considered Plaintiff's loan modification at all, Plaintiff ha[d] alleged insufficient facts to state a claim for breach of the [SPA]").

Thomas v. JPMorgan Chase & Co., 811 F. Supp. 2d 781, 797 (S.D.N.Y. 2011); Edwards v. Aurora Loan Servs., LLC, 791 F. Supp. 2d 144, 151-52 (D.D.C. 2011); Hoffman, 2010 WL 2635773, at *3-*4. As set forth below, the court finds the reasoning in these cases persuasive and concludes that the same reasoning applies here.

"Federal law controls the interpretation of contracts where the United States is a party to the contract." Rivera, 2011 WL 1533474, at *3. "According to federal common law, a third party must be an intended, rather than incidental, beneficiary in order to enforce a contract." Id. at *4. "'Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary.'" Id. (quoting Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1211 (9th Cir. 1999)); see also Edwards, 791 F. Supp. 2d at 151 ("To overcome the 'basic contract principle that third party beneficiaries of a government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract,' a third party must show that the parties 'clear[ly] inten[ded]' that the third party be permitted to sue to enforce the contract." (quoting Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 288 (D.C. Cir. 1993))). "Clear intent is not satisfied by a contract's recitation of interested constituencies, vague hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered with them in mind." Hoffman, 2010 WL 2635773, at *3 (internal quotation marks omitted); see also Edwards, 791 F. Supp. 2d at 151 (same). Rather the "precise language of the contract must demonstrate" a clear intent to permit third parties to enforce the contract. Edwards, 791 F. Supp. 2d at 151. No clear intent exists here for two main reasons.

First, although it is clear (and undisputed) that the SPA was intended to operate to the *benefit* of third-party borrowers, Gorbaty does not identify any language in the SPA that evidences an intent to permit borrowers to *enforce* the agreement against Wells Fargo. To the contrary, the SPA states that "[t]he Agreement shall inure to the benefit of and be binding upon *the parties to the Agreement* and their permitted successors-in-interest." Wells Fargo SPA ¶ 11(E) (emphasis added); see also Rivera, 2011 WL 1533474, at *5. Moreover, the SPA details the remedies specifically available to Fannie Mae alone in the event of default by Wells Fargo. Id. ¶ 6. These provisions strongly suggest that the parties to the SPA did not intend for borrowers to enforce the contract. See Thomas, 811 F. Supp. 2d at 797; Rivera, 2011 WL 1533474, at *5-*6; Edwards, 791 F. Supp. 2d at 151.

Second, "the significant discretion built into the [ ] SPA and the HAMP Guidelines precludes a finding that [Gorbaty] could have reasonably relied on receiving a loan modification." Edwards, 791 F. Supp. 2d at 151; see also Hoffman, 2010 WL 2635773, at *4 ("As many courts have recognized, it would be unreasonable for a qualified borrower seeking a loan modification to rely on the HAMP servicer's agreement as granting him enforceable rights . . . ."). Gorbaty's "receipt of a HAMP modification is subject to a series of wholly discretionary decisions that must be made before such a modification can proceed." Edwards, 791 F. Supp. 2d at 151. First, servicers retain absolute discretion with respect to their decision of whether to *participate* in HAMP. See id.; Phu Van Nguyen, 2010 WL 3894986, at *2. And although Wells Fargo's execution of the SPA required it to take certain actions pursuant to the agreement, see Wells Fargo SPA ¶ 1(A) ("Servicer *shall* perform the loan modification and other foreclosure prevention services . . . described in" other documents (emphasis added)), ¶ 2(A) ("Servicer *shall* perform the Services for *all* mortgage loans it services . . . ." (emphases added));

Marques, 2010 WL 3212131, at *6, HAMP "does not actually require that [Wells Fargo] modify all eligible loans"; it requires "only that [modifications] be *considered*," Hoffman, 2010 WL 2635773, at *4 (emphasis added); see also United States Treasury, Home Affordable Modification Program Supplemental Directive 09-01 ("SD 09-01"), at 1 (Apr. 6, 2009), available at http://www.hppinc.org/_uls/resources/Supplemental_Directive_09-0.pdf (last visited Apr. 18, 2012) ("[P]articipating servicers are required to consider all eligible mortgage loans." (emphasis omitted)). In making that consideration, servicers retain "broad discretion over which loans to modify," Edwards, 791 F. Supp. 2d at 151, including in their calculation of the "net present value" ("NPV") of a loan modification to the taxpayers, which is necessarily linked to the servicer's decision about whether to modify that loan, see SD 09-01 at 4-5; Edwards, 791 F. Supp. 2d at 151-52.

In sum, in light of Gorbaty's failure to point to anything in the SPA that demonstrates an intent to make eligible borrowers third-party beneficiaries with enforceable rights—let alone a clear intent to that effect—as well as the significant discretion built into HAMP procedures, the court joins the overwhelming weight of authority and holds that Gorbaty is not an intended third-party beneficiary of the SPA. Thus, Gorbaty fails to state a claim for breach of contract. And because leave to replead this claim would be futile, it is dismissed with prejudice. See Thomas, 797 F. Supp. at 802 ("Plaintiffs have no standing to enforce the SPA, rendering futile any attempt to replead their claims for breach of the SPA.").

## E. Fifth Amendment Due Process Clause

Relatedly, Gorbaty alleges that Wells Fargo violated the Due Process Clause of the Fifth Amendment as a result of Wells Fargo's alleged violations of HAMP. (Mortg. Compl. ¶¶ 67-75; Equity Compl. ¶¶ 117-26.) In particular, Gorbaty argues that Wells Fargo violated the Due

Process Clause by failing to: (1) provide Gorbaty with "meaningful written notice" regarding its decision to deny her request for a HAMP modification and the reasons for that decision (Mortg. Compl. ¶ 71; Equity Compl. ¶ 121); and (2) provide Gorbaty with a procedure to challenge its decision to deny her a loan modification (Mortg. Compl. ¶¶ 72-73; Equity Compl. ¶¶ 122-23). These allegations fail to state a Due Process claim.

The Fifth Amendment states: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend V. "In order to prevail on a due process claim, a claimant must [1] identify a constitutionally protected property . . . interest and [2] demonstrate that the government has deprived that party of the interest without due process of law." Weinstein v. Albright, 261 F.3d 127, 134 (2d Cir. 2001). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire . . . [or] unilateral expectation," but must instead "have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

The court must therefore determine whether Gorbaty has a legitimate claim of entitlement to a HAMP loan modification.[25] See Huxtable v. Geithner, No. 09-CV-1846 (CAS) (AGR), 2010 U.S. Dist. LEXIS 91382, at *12 (S.D. Cal. Sept. 2, 2010). Gorbaty asserts that because "Wells Fargo['s] discretion to grant or deny a borrower a modification under HAMP is strictly limited by HAMP program rules set forth in the Program Documentation," HAMP "create[s] a property interest on behalf of the borrower protected by the Fifth Amendment." (Mortg. Compl. ¶¶ 69-70.) However, Gorbaty's position is contrary to that of every court to have considered issue. See Ozogu v. Citimortgage, Inc., No. 10-CV-9687 (CAS) (AGR), 2011 WL 2940391, at

---

[25] Because the court concludes that Gorbaty's Complaints fail to allege a constitutionally protected property interest, it need not decide whether Wells Fargo has committed a "state action" for the purposes of the Fifth Amendment, which is also in dispute. Flagg v. Yonkers Sav. & Loan Ass'n, FA., 396 F.3d 178, 186 (2d Cir. 2005).

*6 (C.D. Cal. July 19, 2011) (collecting cases). The court finds these cases persuasive and rejects Gorbaty's claim for several reasons.

First, the "absence of any restriction on the government" with respect to loan modifications is "fatal to [Gorbaty's] Due Process Clause claim." Edwards, 791 F. Supp. 2d at 153; see also Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). The Treasury was not required to create HAMP, retains discretion to "modify the program as it sees fit," and may "end HAMP at any time." Edwards, 791 F. Supp. 2d at 153; see also Williams v. Geithner, No. 09-CV-1959 (ADM) (JJG), 2009 WL 3757380, at *6 (D. Minn. Nov. 9, 2009) (noting that the statute pursuant to which HAMP was created "does not create an absolute duty on the part of the Secretary to consent to loan modifications" but rather "provides that loans may be modified 'where appropriate'—a phrase that limits the Secretary's obligation and evinces a Congressional intent to afford discretion in the decision whether to modify loans" (quoting 12 U.S.C. § 5219)). Second, as discussed above, servicers are not obligated to participate in HAMP. Phu Van Nguyen, 2010 WL 3894986, at *2. Third, even those servicers who opt to participate in HAMP "can opt out of the program if the HAMP guidelines are changed." Huxtable, 2010 U.S. Dist. LEXIS 91382, at *14. And finally, "servicers have discretion to modify certain key variables in the NPV model, giving servicers the right to determine, at least to some extent, who is eligible and who is not." Id.

"The existence of so many discretionary points to the process renders any borrower's expectation and entitlement to a modification too uncertain to warrant protection under the Due Process Clause." Edwards, 791 F. Supp. 2d at 155 (citing Castle Rock, 545 U.S. at 764). Thus, Gorbaty's Complaints fail to state a claim under the Fifth Amendment. Gorbaty will not be

granted leave to replead this claim because any such leave would be futile; the claim is dismissed with prejudice. See LaBounty, 2 Fed. Appx. at 200; Cuoco, 222 F.3d at 112.

**F.    DPA**

Gorbaty asserts claims under the DPA based on the allegedly misleading disclosure documents discussed above. (Mortg. Compl. ¶¶ 51-59; Equity Compl. ¶¶ 75-84.) The DPA prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in *this state*." N.Y. Gen. Bus. L. § 349(a) (emphasis added). As the New York Court of Appeals has stated, "to qualify as a prohibited act under the [DPA], the deception of a consumer must occur in New York," because "the intent is to protect consumers in their transactions that take place in New York State." Goshen v. Mut. Life Ins. Co. of N.Y., 98 N.Y.2d 314, 325 (N.Y. 2002); see also Thomas, 811 F. Supp. 2d at 800 ("The [DPA] was not intended to police out-of-state transactions." (internal quotation marks omitted)).

Gorbaty's Complaints contain no allegation that any of the alleged deception occurred in New York. To the contrary, based on the Complaints, the closing for both her Mortgage and Equity Loans occurred in New Jersey, and the proceeds of those loans were used to purchase a primary residence in New Jersey. Although Gorbaty may have resided in New York at the time she applied for the loan, and may have received some of the disclosures with alleged misrepresentations while she was in New York, it appears that any deception caused by the alleged non-disclosures and misrepresentations occurred at the closing in New Jersey, where the mortgage and loan documents were executed. Thus, Gorbaty's Complaints currently fail to state a claim under the DPA. See Thomas, 811 F. Supp. 2d at 800 (dismissing DPA claim because plaintiffs were "residents of New Jersey, and the mortgages at issue in th[e] case [we]re (i) for homes located in Jersey, and (ii) were loaned by branches located in New Jersey"); Wiener v.

34

Unumprovident Corp., 202 F. Supp. 2d 116, 120 (S.D.N.Y. 2002) (dismissing DPA claim based on insurer's termination of disability benefits because, although "plaintiff's application for the insurance policies was submitted in New York," plaintiff was "a New Jersey resident and received her benefits in New Jersey").

In Gorbaty's written objections to the R&R, she vaguely suggests that "closing began partially in New York." (Pl. Obj. at 27.) Gorbaty will be given leave to replead her DPA claim to elaborate on this assertion. Should Gorbaty wish to pursue a claim under the DPA, she must allege sufficient facts to show that the deception she complains of occurred in New York.[26]

### G.     Breach of the Implied Covenant of Good Faith and Fair Dealing

With respect to her Mortgage Loan, Gorbaty asserts a claim for breach of an implied covenant of good faith and fair dealing. (Mortg. Compl. ¶¶ 77-81; see also Pl. Obj. at 27-28.) "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes its contracting partner." Edwards, 791 F. Supp. 2d at 152-53. Gorbaty alleges that Wells Fargo breached this covenant based upon: (1) its refusal to modify her mortgage loan pursuant to HAMP; and (2) its alleged failure to service her loans properly. (Mortg. Compl. ¶¶ 78-80.) Neither of these grounds supports Gorbaty's claim.

First, as discussed above, Gorbaty is neither a party to nor an intended third-party beneficiary of the SPA entered into between Wells Fargo and the Federal Government pursuant to HAMP; thus, Wells Fargo did not owe Gorbaty any duties under the implied covenant. See Thomas, 811 F. Supp. 2d at 799 (holding that because "plaintiffs were neither parties to the SPA

---

[26]     If Gorbaty amends her Complaints to show deceptive practices occurring in New York, the court will address the additional issue of whether Gorbaty has sufficiently alleged that the acts complained of "have a broad[] impact on consumers at large," Hayrioglu v. Granite Capital Funding, LLC, 794 F. Supp. 2d 405, 410 (E.D.N.Y. 2011), which Wells Fargo argues she has not (see Def. Mem. at 13-14).

nor intended third-party beneficiaries of that agreement . . . , they cannot enforce any covenant of that agreement, express or implied"); Edwards, 791 F. Supp. 2d at 153.

Second, Gorbaty has not stated a claim for breach of the implied covenant based on Wells Fargo's alleged failure to service her loans properly. Under New York law,[27] "a claim asserting a breach of the implied covenant of good faith and fair dealing [does] not survive dismissal as a matter of law pursuant to Fed. R. Civ. P. 12(b)(6) if it fails to describe the specific actions on the part of . . . defendants that allegedly breached this duty." Stanford Square, LLC v. Nomura Asset Capital Corp., 228 F. Supp. 2d 293, 300 (S.D.N.Y. 2002). And "[a] claim for breach of the covenant of good faith and fair dealing may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." CSI Inv. Partners, LP v. Cendant Corp., 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007). Under New Jersey law, a plaintiff asserting a breach of the implied covenant must establish, among other things, that "the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract," and that "the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm." Jatras v. Bank of Am. Corp., No. 09-CV-3107 (RBK) (KMW), 2010 WL 5418912, at *7 (D.N.J. Dec. 23, 2010).

Gorbaty's allegations of Wells Fargo's breaches of the implied covenant and the alleged resulting damages are too vague and conclusory to state a claim. Gorbaty alleges that Wells Fargo "fail[ed] to perform loan servicing functions consistent with its responsibilities"; "fail[ed] to properly supervise its agents and employees"; "routinely demand[ed] information already in

---

[27]     Because the parties did not address whether New York or New Jersey law applies to Gorbaty's common law claims, and because the result would be the same under either jurisdiction's law, the court will analyze Gorbaty's claims under both New York and New Jersey law. See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005) ("[W]here the court has determined that the result would be same under either jurisdiction's law, it need not decide which to apply." (emphasis omitted)).

its files"; "fail[ed] to follow through on written and implied promises"; and "fail[ed] to follow through on contractual allegations." (Mortg. Compl. ¶ 79.) But the Mortgage Complaint contains no allegation of the specific failures by Wells Fargo to service Gorbaty's Mortgage Loan. Moreover, Gorbaty does not explain how Wells Fargo's alleged failures in servicing deprived her of the benefit of her Mortgage Loan or otherwise caused her to suffer damages. See CSI, 507 F. Supp. 2d at 425; Jatras, 2010 WL 5418912, at *7.

In sum, Gorbaty's Mortgage Complaint fails to state a claim for breach of the implied covenant of good faith and fair dealing. Gorbaty will not be given leave to replead her claim for breach of the implied covenant based on Wells Fargo's refusal to modify her loan pursuant to HAMP, because any such amendment would be futile. See Thomas, 811 F. Supp. 2d at 802. Gorbaty will, however, be given leave to replead her claim for breach of the implied covenant based on Wells Fargo's alleged failure to properly service her loans. Should Gorbaty wish to pursue such a claim, she must allege specific actions on the part of Wells Fargo resulting in a failure to properly service her loan, which deprived her of the benefit of her Mortgage Loan.

**H.    Fraud**

Gorbaty brings a fraud claim with respect to her Equity Loan. (Equity Compl. ¶¶ 86-88.) She alleges that Wells Fargo "fraudulently, intentionally, and knowingly induced [her] to enter into the subject mortgage transaction" by failing to disclose "the true terms of the loan." (Id. ¶ 86.) In particular, as discussed above, Gorbaty alleges that she was told that her Equity Loan was a conventional thirty-year loan, but that Wells Fargo changed the terms of the loan to require fifteen years of payments followed by a final balloon payment without informing Gorbaty of this change. (Id. ¶¶ 45, 53-54, 56, 86) Gorbaty's Equity Complaint is currently insufficient.

To state a claim for fraud, the plaintiff must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001). Wells Fargo argues that Gorbaty has failed to adequately plead the elements of a materiality, intent to defraud, reliance, and resulting injury. (See Def. Mem. at 20-22.) The court concludes that Gorbaty has adequately pleaded each of these elements except for the last.

        1.     Materiality and Intent to Defraud

With respect to the first two elements of a fraud claim, the plaintiff must meet the heightened specificity requirement of Federal Rule of Civil Procedure 9(b). See Camofi Master LDC v. Riptide Worldwide, Inc., No. 10-CV-4020 (RM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011). That Rule states: "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In accordance with this heightened standard, the Second Circuit has held that a complaint alleging fraud "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993). The plaintiff must allege facts "that give rise to a strong inference of fraudulent intent . . . either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

Gorbaty has satisfied the heightened specificity requirement of Rule 9(b) with respect to the first two elements of her claim. Gorbaty (1) has specified the statement that she claims was fraudulent (the statement that she would be receiving a thirty-year loan with no balloon payment); (2) has identified the speaker (Wells Fargo); (3) has stated where and when the statement was made (in the TILDS-1 and GFE prior to closing); and (4) has explained why the statement was fraudulent (because Wells Fargo in fact intended to ultimately grant Gorbaty a fifteen-year loan, and never informed Gorbaty of that fact). See Mills, 12 F.3d at 1175.

Wells Fargo argues that Gorbaty has failed to sufficiently allege a material misrepresentation because the GFE and TILDS-1 "are merely estimates of the final documents which are—and were here—provided and signed at the closing on July 23, 2007," and "[a]n alleged misrepresentation 'must be factual in nature and not promissory or relating to future events that might never come to fruition.'" (Def. Mem. at 20 (quoting Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20-21 (2d Cir. 2000)).) But as discussed above with respect to Gorbaty's TILA claims, the court may not rely upon either the mortgage and note submitted by Wells Fargo or Gorbaty's purported signature of the TILDS-2 as the basis of a finding that Gorbaty knew the true terms of her Equity Loan or was informed of those terms by Wells Fargo, because Gorbaty disputes the authenticity of these documents and asserts that they were not provided to her at closing. (See Part III.B.2.a, supra.) Putting those documents aside, Wells Fargo does not dispute that the difference between a fifteen-year loan and a thirty-year loan would be important to a reasonable borrower and that, therefore, Wells Fargo made a material omission in failing to disclose the change in terms. See AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 234 (2d Cir. 2000) ("The test for materiality is whether a reasonable [investor] would consider the particular information significant . . . .").

Wells Fargo argues next that Gorbaty has not adequately pleaded intent to defraud because she "alleges only conclusorily that Wells Fargo 'fraudulently, intentionally, and knowingly induced Mrs. Gorbaty to enter into the subject mortgage transaction by providing [disclosures] which did not reflect the true terms of the loan provided to Mrs. Gorbaty.'" (Def. Mem. at 21 (quoting Equity Compl. ¶ 86).) But although the section of Gorbaty's Equity Complaint devoted specifically to fraud is somewhat sparse, the factual allegations incorporated by reference into that section (see Equity Compl. ¶ 89) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128. Accepting Gorbaty's allegations as true and disregarding documents submitted Wells Fargo whose authenticity is in dispute, the court finds simply that (1) Wells Fargo told Gorbaty that she would be receiving a thirty-year loan and (2) Wells Fargo changed the terms of the loan without telling her. Indeed, as discussed above, Wells Fargo does not appear to dispute that Gorbaty was provided with the TILDS-1 and the GFE, and that those documents contain terms that were materially different from those of the Equity Loan she ultimately received. Gorbaty does not point to specific evidence of Wells Fargo's knowledge of the falsity of its statements, but that is not her burden at the motion to dismiss stage. See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). It is enough for now that Gorbaty has alleged facts that "give rise to a strong inference of fraudulent intent." Shields, 25 F.3d at 1128.

2. Reliance

Wells Fargo argues that Gorbaty has not established the element of reasonable reliance upon the alleged misrepresentations because "she provides no explanation as to why she relied on an earlier TILA Disclosure Statement[] instead of the July 23, 2007 Disclosure Statement that she signed and dated at closing," or "instead of the Note and Mortgage she signed at the closing,

which memorialize the loan terms." (Id. at 21.) Once again, Wells Fargo is not entitled to rely upon these disputed documents as a basis for its motion to dismiss. At this stage, Gorbaty has adequately pleaded reliance by alleging that she would have "walk[ed] away from the loan" if she had known the truth about its terms. (Equity Compl. ¶ 22.) See In re Merrill Lynch & Co. Research Reports Sec. Litig., 568 F. Supp. 2d 349, 358 (S.D.N.Y. 2008) ("To plead . . . reliance, a plaintiff need only allege that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental [ ] transaction.'" (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003))).

3.    Resulting Injury

Finally, Wells Fargo argues that Gorbaty has not adequately alleged that she suffered injury as a result of the purported misrepresentations. (Def. Mem. at 22.) The court agrees.

In order to state a claim for fraud, Gorbaty must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428, 456 (S.D.N.Y. 2003). Gorbaty's damages must have been "proximately caused by the alleged misrepresentations." Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992). "[A]n injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." Id.

Gorbaty alleges that she "suffered serious injury as the proximate cause of her reliance on the defendants' intentional misrepresentations and failures to disclose," that she "has suffered harm as a result of Defendant Wells Fargo[']s actions and omissions," and that she is "on the verge of losing her house." (Equity Compl. ¶¶ 35, 87.) Gorbaty provides no specific allegation, however, linking her alleged injuries to Wells Fargo's failure to accurately disclose the terms of

the Equity Loan. Even assuming that Gorbaty would not have entered into the transaction had she known the true terms of the Equity Loan (see id. ¶ 22), the only injury Gorbaty claims to have suffered as a result of entering into that transaction is her current inability to make payments on the loan and the resulting potential that Wells Fargo might foreclose on her home (see id. ¶¶ 35, 87). But it has been less than five years since Gorbaty executed the Equity Loan, so she will not be required to make the balloon payment on the Equity Loan for more than ten years. Thus, on the current record, there is no reason to conclude that Gorbaty's inability to make payments on the Equity Loan resulted from Gorbaty's receipt of a fifteen-year loan with a balloon payment; instead, it appears that Gorbaty would be in the same current position had she received the thirty-year loan she thought she was getting.

Gorbaty's Equity Complaint therefore currently fails to state a claim for fraud. Gorbaty will be given leave to amend her Equity Complaint in this regard. In order to state a valid fraud claim, Gorbaty must allege: (1) how she has been damaged; and (2) how her injuries were caused specifically by her *receipt of a fifteen-year loan rather than a thirty-year loan*—i.e., the basis of the purported material omission.

## I.    Conspiracy to Commit Fraud

Finally, Gorbaty's Equity Complaint asserts a claim for "Civil Conspiracy to Commit Fraud" alleging that the two Defendants named in her Equity Complaint "knowingly entered into an agreement to fraudulently induce Mrs. Gorbaty to enter into the subject mortgage." (Equity Compl. ¶ 90.) However, "it is well settled that New York does not recognize an independent civil tort of conspiracy. While a plaintiff may allege, in a claim of fraud or other tort, that parties conspired, the conspiracy to commit a fraud . . . is not, of itself, a cause of action." Hoeffner v. Herrington & Sutcliffe LLP, 85 A.D.3d 457, 458 (N.Y. App. Div. 2011) (citations omitted); see

also <u>Scala v. Sequor Grp., Inc.</u>, No. 94-CV-0449 (LAP), 1995 WL 225625, at *9 (S.D.N.Y. Apr. 14, 1995) ("Courts have ruled that the pleading of conspiracy may be made only to connect the actions of the defendants with an actionable injury and to establish that these acts flowed from a common scheme or plan."); <u>Alexander & Alexander of N.Y., Inc. v. Fritzen</u>, 68 N.Y.2d 968, 969 (N.Y. 1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."). The same is true of New Jersey. <u>See Brown ex rel. Estate of Brown v. Philip Morris Inc.</u>, 228 F. Supp. 2d 506, 517 n.10 (D.N.J. 2002). Thus, to the extent that Gorbaty attempts to assert a separate cause of action for civil conspiracy, that cause of action must be dismissed with prejudice.

If Gorbaty's fraud claim fails, so must her allegations of conspiracy to commit fraud. <u>See Brown</u>, 228 F. Supp. 2d at 517 n.10; <u>Scala</u>, 1995 WL 225625, at *9. If Gorbaty successfully amends her Equity Complaint to state a valid fraud claim (<u>see</u> Part III.H, <u>supra</u>), Gorbaty may rely upon allegations of conspiracy to connect the actions of the two Defendants named in her Equity Complaint to the fraud claim. <u>See Scala</u>, 1995 WL 225625, at *9; <u>Alexander</u>, 68 N.Y.2d at 969. As of now, however, the Equity Complaint's statement that "Defendant knowingly entered into an agreement to fraudulently induce Mrs. Gorbaty to enter into the subject mortgage" (Equity Compl. ¶ 90) is far too conclusory to sufficiently allege "an agreement between two or more parties"— an essential element of a civil conspiracy claim. <u>Meisel v. Grunberg</u>, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009). If Gorbaty seeks to amend her Equity Complaint to state a valid fraud claim *and* seeks to connect the two Defendants' fraudulent actions through a claim of conspiracy, she should amend her Equity Complaint to ensure that it alleges all of the elements of conspiracy: "(1) an agreement between two or more parties; (2) an

43

overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury." Id.

## IV. CONCLUSION

For the foregoing reasons, the court concludes as follows:

Wells Fargo's motion to dismiss Gorbaty's RESPA claims is GRANTED WITHOUT PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's TILA claim based on Wells Fargo's failure to provide a TILDS for her Mortgage Loan is GRANTED WITHOUT PREJUDICE; Wells Fargo's motion to dismiss Gorbaty's TILA claim based on Wells Fargo's failure to disclose the alleged change in the terms of her Equity Loan is DENIED; Wells Fargo's motion to dismiss Gorbaty's TILA claim based on Wells Fargo's failure to disclose a right of rescission is GRANTED WITH PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's HOEPA claims is GRANTED WITH PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's claims for breach of contract related to HAMP and 2MP is GRANTED WITH PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's claims under the Fifth Amendment Due Process Clause is GRANTED WITH PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's DPA claims is GRANTED WITHOUT PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's claim for breach of the implied covenant of good faith and fair dealing based on Wells Fargo's refusal to modify her Mortgage Loan pursuant to HAMP is GRANTED WITH PREJUDICE; Wells Fargo's motion to dismiss

Gorbaty's claim for breach of the implied covenant of good faith and fair dealing based on Wells Fargo's failure to properly service her loans is GRANTED WITHOUT PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's fraud claim is GRANTED WITHOUT PREJUDICE.

Wells Fargo's motion to dismiss Gorbaty's claim for civil conspiracy to commit fraud is GRANTED WITH PREJUDICE.

To summarize the claims that are still at issue, one claim definitively survives Wells Fargo's motion to dismiss: Gorbaty's TILA claim based on Wells Fargo's failure to disclose the alleged change in the terms of her Equity Loan. All of Gorbaty's other claims are currently insufficient, but Gorbaty is given leave to amend: (1) her claims under §§ 2605 and 2607 of RESPA; (2) her TILA claim based on Wells Fargo's failure to provide a TILDS for her Mortgage Loan; (3) her DPA claims; (4) her claim for breach of the implied covenant of good faith and fair dealing based on Wells Fargo's failure to service her loans properly; and (5) her fraud claim (along with any specific allegations of conspiracy that would connect the two Defendants named in the Equity Complaint to the alleged fraud). Gorbaty may within thirty days of the date of this Order file amended Complaints with respect to these claims, in accordance with the instructions set forth in this Memorandum and Order. If Gorbaty fails to do so, these claims will be dismissed with prejudice.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     April 16 , 2012

NICHOLAS G. GARAUFIS
United States District Judge